## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MONIQUE ALMEIDA,                    :
       Plaintiff,                    :
                           :
       v.                              :
                           :       Case No. 3:07cv517 (PCD)
ATHENA HEALTH CARE                 :
ASSOCIATES, INC. AND BAYVIEW       :
HEALTH CARE CENTER, INC.,          :
       Defendants.                   :

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Monique Almeida ("Almeida") brings this action alleging sexual harassment and the creation of a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991 ("Title VII") (Count One) and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60, et seq. (Count Three).  Plaintiff also alleges retaliatory discharge in violation of Title VII and the CFEPA (Counts Two and Four, respectively).  Finally, Plaintiff alleges violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq., specifically interference with her FMLA rights (Count Five) and retaliatory discharge for exercising her FMLA rights (Count Six).  Defendants Athena Health Care Associates, Inc. ("Athena") and Bayview Health Care Center, Inc. ("Bayview") move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment as to all claims.  Additionally, Defendants maintain that all claims against Defendant Athena must be dismissed because Athena never employed Plaintiff and therefore is not liable to her, but Plaintiff has identified sufficient factual questions on this issue to preclude summary judgment.  For the reasons stated herein, Defendants' motion for summary judgment [Doc. No. 34] is **denied.**

I.      **Background**

        For purposes of this motion, the court accepts facts as true if undisputed by the parties

and resolves issues of disputed fact in favor of Plaintiff as the non-moving party, where there is

some evidence to support her claims.

        Bayview is a nursing home located in Waterford, Connecticut, which is owned by

Lawrence Santilli, Chakalus Bayview LLC, and employs approximately 201 employees.  Athena

is a management company, which contracts with various independently owned long-term care

facilities, including Bayview, to provide certain enumerated management services.  Defendants

maintain that Athena did not employ Plaintiff, which Plaintiff contests. (Rule 56 Statements, ¶ 4)

        Plaintiff was hired as a Certified Nurses Assistant ("CNA") by Bayview in 1995.  In

2000, Plaintiff applied for and received a job as a unit secretary with Bayview.  While working as

a unit secretary, Plaintiff also periodically worked as a CNA at Bayview on a *per diem* basis.  In

January 2003, Darryl LeCours became the Administrator of Bayview.  In 2003, Plaintiff

voluntarily resigned as unit secretary from Bayview and accepted full-time employment

elsewhere.  However, she continued to work as a *per diem* CNA at Bayview.  After a few

months, Plaintiff expressed interest to Bayview's Director of Nursing Susan Barnard, whose

name at the time was Susan Decarlo, in returning to work full-time at Bayview.  Plaintiff was

then rehired as a full-time CNA at Bayview.  Subsequently, Plaintiff was reassigned to an open

unit secretary position, after she re-applied for that position.

**Plaintiff's Sexual Harassment Allegations**

        Plaintiff states that in early 2003, LeCours called Plaintiff into his office, asked her if she

was divorced, and then told her that he "pays his fucking bitch ex-wife $800 a month child

2

support for his daughter." (Pl. Dep. at 62)  In early 2005, when Plaintiff was again in LeCours' office, he told her that when he kicked his ex-wife out of the house, she yelled back at him from the front lawn, "Who are you going to get to suck your dick now?"  He also said of his ex-wife that "sleeping with her was not worth all the money that she had taken out of [their] account." He also told Plaintiff that although his ex-wife was blonde, she had red pubic hair.

One day when Plaintiff had straightened her hair before work, LeCours walked by her desk and said, "Oh, who is that new, sexy employee with straight hair?"  Plaintiff also contends that LeCours repeatedly referred to women as "fucking bitches," and generally swore and used inappropriate language, which was witnessed by many employees.  Finally, Plaintiff alleges that LeCours would stand next to her "a little too close for comfort," causing her to leave the area to get away from him, and to avoid him as much as possible.

Plaintiff reports that Director of Nurses Susan Barnard discussed her "love swing," a device that "attaches to the ceiling that you can sit in and have intercourse" (Barnard Dep. at 33) with Plaintiff and other employees on several occasions when they were outside on smoking breaks. (Pl. Dep. at 110)  Plaintiff states that Barnard was trying to sell the swing and asked Plaintiff if she wanted to buy it, and also that Barnard "talked about how she used sexual toys, dildos, lotions, the oils.  She asked me if I used such things."  (Pl. Dep. at 108) Plaintiff "told her that's disgusting." Id.  Barnard contends that the discussions of the love swing were instigated by other employees teasing her about owning it and asking whether she had sold it yet (Barnard Dep. at 37), while Plaintiff denies that other employees ever initiated these discussions.  (Pl. Dep. at 110.)  Barnard maintains that "the content of the discussion was not descriptive" but rather was merely about "the fact that I owned [the swing]."  (Barnard Dep. at 37) Plaintiff states that

3

she told Barnard that she found such conversations "disgusting" and that Plaintiff called Human Resources representative Thao Dinh to report the conversations but never received a return phone call.  (Pl. Dep. at 111)

**Plaintiff's Prior FMLA Leave Usage**

In 1999, Plaintiff took FMLA leave on an intermittent basis and without any objection to care for her daughter.  In 2004, Plaintiff took leave, again on an intermittent basis and without any objection, to care for her mother.  In early 2005, Bayview granted Plaintiff leave to care for her fiancee.  During the summer of 2005, Plaintiff took a three month medical leave to have bunions removed from her foot.  Plaintiff contends that Barnard wanted her to return from this leave sooner than recommended by Plaintiff's doctor, and that Barnard gave the receptionist at Plaintiff's doctor's office "a really hard time" about how soon Plaintiff could return to work.  (Pl. Dep. at 37-38)  Shortly after returning to work, Plaintiff took an additional day of FMLA leave on August 22, 2005 because her mother was hospitalized.

**Plaintiff's Termination**

On March 15, 2006, Plaintiff told Barnard that she would need medical leave for upcoming surgery to have bunions removed from her other foot.  Barnard reportedly asked, "Does this mean you're going to take another three months off?"  Barnard doesn't recall whether she said that, but states that "It's a good possibility I might have asked her that to see how long she would be gone."  (Barnard Dep. at 43-44)  The following day, Barnard issued a letter to Plaintiff which read in relevant part:

> "Yesterday you advised me that you were planning on elective surgery on April 6, 2006. You became eligible for your first Family Medical Leave on September 28, 2004 to take care of your mother.  Subsequently, you received additional FMLA time for yourself for

your foot surgery and for the care of your significant other. Upon calculation of lost time due to FMLA, it has been determined that until September 28, 2006, you have five weeks of FMLA time left available to you per federal law guidelines.  Please be advised that any time taken beyond the five weeks of remaining leave between now and September 28, 2006 will result in loss of benefits and termination of employment under the law."
(Pl.'s Ex. 10)

Four days later, on March 20, 2006, Plaintiff's employment at Bayview was terminated. Plaintiff had not yet had a chance to fill out the FMLA paperwork regarding her upcoming surgery.  Plaintiff was called in to meet with Barnard and LeCours.  LeCours asked her whether she was happy with her job.  Plaintiff responded, "I am not that happy with my job" because she was restricted to 30 hours per week as a Unit Secretary.  (Pl. Dep. at 89) Plaintiff told LeCours that she felt that the work required more than 30 hours per week and that she "can't get the job done" without working additional hours.  Id.  Plaintiff had been issued a written warning on September 19, 2005 for working over 30 hours in a week without prior permission from a supervisor.  (Def.'s Ex. I)  Plaintiff then added, "All around I love my job." (Pl. Dep. at 90) LeCours allegedly stated, "Well, we're going to have to let you go because you're not happy." Id. LeCours told Plaintiff that she had a "negative attitude."  (Pl. Dep. at 92)  Plaintiff asked, "Overall job performance-wise, what am I not doing to lead to this?" and LeCours responded, "Oh, nothing."  (Pl. Dep. at 90)  Plaintiff asked, "You're getting rid of me because I'm not happy?" and LeCours said, "Yeah, but don't worry.  I won't fight unemployment.  I know you need a paycheck."  Id.

About a month after Plaintiff was terminated, in April or May, 2006, Athena's Director of Operations Ilene Berkon-Cardello asked LeCours to resign from his position because, as LeCours reports, "She said that I was running a second job out of their building, that I swore at staff, that I

5

didn't come to work, that I had inappropriate relationships with people." (LeCours Dep. at 16-17)  On July 13, 2006, Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO").

## II.      Standard of Review

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56©.  No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  However, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).  The moving party bears the burden of establishing that summary judgment is appropriate. Anderson, 477 U.S. at 225.  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

6

**III.    Discussion**

**A.    Status of Athena as an Employer**

Defendants have moved for summary judgment as to all counts against Defendant Athena Health Care Associates, Inc. ("Athena"), arguing that Athena did not employ Plaintiff and therefore cannot be liable to her.  Plaintiff has noted the similarities between this case and Peltier v. Apple Health Care, Inc., 130 F. Supp. 2d 285 (D. Conn. 2000).  There, Plaintiff Nancy Peltier had been a staff nurse at Brightview Nursing and Retirement Center, Ltd., which was managed by Apple Health Care, Inc. ("Apple"), and she brought age and disability discrimination claims against both entities.  The district court denied Defendants' motion for summary judgment as to Plaintiff's claims against Apple, finding a genuine issue of fact as to whether Apple might be liable to the Plaintiff under either the single or joint employer doctrines.

As the Second Circuit has explained, "[a] single employer situation exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a single employer." Clinton's Ditch Coop. Co., Inc. v. NLRB., 778 F.2d 132, 137 (2d Cir. 1985), cert. denied, 479 U.S. 814, 93 L. Ed. 2d 25, 107 S. Ct. 67 (1986), quoting NLRB v. Browning-Ferris Indus. of Pa., Inc., 691 F.2d 1117, 1122 (3d Cir. 1982) (quotation marks omitted). "The single employer standard is relevant when separate corporations are not what they appear to be, that in truth they are but divisions or departments of a single enterprise." Id., quoting NLRB v. Deena Artware, Inc., 361 U.S. 398, 402, 80 S. Ct. 441, 443, 4 L. Ed. 2d 400 (1960) (quotation marks omitted).  "The Second Circuit has adopted a flexible four-factor test to determine whether two separate entities qualify for single employer status." Peltier, 130 F. Supp. 2d at 288, citing  Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1241

(2d Cir. 1995).  The factors are: "(1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." <u>Murray v. Miner</u>, 74 F.3d 402, 404 (2d Cir. 1996).

"In contrast [to a single employer situation], in a joint employer relationship, there is no single integrated enterprise. A conclusion that employers are joint assumes that they have merely chosen to handle certain aspects of their employer-employee relationships jointly." <u>Peltier</u>, 130 F. Supp. 2d at 290, quoting <u>Clinton's Ditch Coop. Co.</u>, 778 F.2d at 137 (internal quotation marks omitted) (citing <u>NLRB v. Browning-Ferris Indus. of Pa., Inc</u>., 691 F.2d at 1122). The factors relevant to determining joint employer status are "whether the alleged joint employer (1) did the hiring and firing; (2) directly administered any disciplinary procedures; (3) maintained records of hours, handled the payroll, or provided insurance; (4) directly supervised the employees; or (5) participated in the collective bargaining process." <u>AT&T v. NLRB</u>, 67 F.3d 446, 451 (2d Cir. 1995).

Despite being the moving party, Defendants have provided very little legal or factual argument to support their contention that Athena did not employ Plaintiff.  Aside from noting that Plaintiff received her W-2 tax document from Bayview, not Athena (Def.'s Memo. in Supp. of Mot. for Summ. Judgment at 8), the following is the entirety of Defendants' factual argument as to why Athena cannot be held liable as Plaintiff's employer:

> Athena provides operational and financial services to various facilities, such as Bayview, but does not provide payroll services, which each facility handles itself.  Likewise, while Athena may coordinate employment applications, with the exception of certain upper-level management positions, staffing decisions, including termination, are made by the individual facility.  Further, while Athena may assist with some human resources services, each facility employs its own human resources director, distributes its own employee handbook, and maintains its own personnel records.  Finally, there is no

8

evidence that Athena directly administered any disciplinary procedures at Bayview or directed any of Plaintiff's work at Bayview.
(Def.'s Reply at 1-2; internal citations omitted)

By contrast, Plaintiff provides extensive evidence of the degree of inter-relation between Athena and Bayview, and the significant degree of control exercised by the former over the operations of the latter. (See Opp. to Mot. for Summ. Judgment at 10-18, and Sur-Reply at 1-2)  Specifically, Athena and Bayview shared common officers, in that Lawrence G. Santilli was both the Managing Member of Bayview and the President of Athena Health Care Associates, Inc.  Athena provided retirement benefits to Plaintiff and sponsored the health insurance benefits of Bayview employees.  In its submissions to the CHRO, Athena characterized itself as having "hired" and "terminated" Plaintiff.  Barnard's memo to Plaintiff regarding her remaining FMLA leave time was carbon copied to "Athena Corporate."  The employee complaint form regarding Plaintiff's 2002 complaint was on Athena letterhead, and Bayview's employee handbook advises employees to bring sexual harassment complaints and employee grievances to Athena if they are not addressed satisfactorily by Bayview.

Most importantly, Bayview's Administrator Darryl LeCours testified that Athena's Director of Operations Ilene Berkon-Cardello approved Plaintiff's termination (LeCours Dep. at 44-45, 49), and that the standard procedure in terminating a Bayview employee was to first seek Athena's approval (LeCours Dep. at 18).  Centralized control of labor relations, as demonstrated by entities sharing policies concerning "hiring, firing, and training employees, and in developing and implementing personnel policies and procedures" is a key factor in the single employer test. Peltier, 130 F. Supp. 2d at 288-289, quoting Owens v. American Nat'l Red Cross, 673 F. Supp. 1156, 1161 (D. Conn. 1987); see Meng v. Ipanema Shoe Corp., 73 F. Supp. 2d 392, 403

(S.D.N.Y. 1999); <u>see also</u> <u>Lihli Fashions Corp., Inc. v. NLRB</u>, 80 F.3d 743, 747 (2d Cir. 1996)

(noting that all four factors need not be met and that most courts focus their inquiry on

centralized control of labor relations); <u>see also</u> <u>Gulino v. N.Y. State Educ. Dep't</u>, 460 F.3d 361,

371 (2d Cir. 2006) (explaining that in determining whether an entity is an employer for Title VII

or ADA purposes, no one factor is determinative, <u>Comty. for Creative Non-Violence v. Reid</u>, 490

U.S. 730, 752, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989), and "the common-law element of

control is the principal guidepost that should be followed," <u>Clackamas Gastroenterology Assocs.,</u>

<u>P.C. v. Wells</u>, 538 U.S. 440, 448, 123 S. Ct. 1673, 155 L. Ed. 2d 615 (2003)).  Plaintiff has

identified sufficient factual questions on the issue of whether Athena employed Plaintiff under

either the single or joint employer doctrines to preclude summary judgment.

**B.      Sexual Harassment Claims**

As a preliminary matter, Defendants argue that several of Plaintiff's harassment

allegations are untimely.  Title VII requires that a complaint of discrimination be made to the

federal Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged

discrimination, in situations where a complaint has also been filed with the state Commission on

Human Rights and Opportunities ("CHRO").  <u>See</u> 42 U.S.C. § 2000e-5(e)(1).  Plaintiff's CHRO

complaint was filed on July 13, 2006, 300 days prior to which was September 16, 2005.

Defendants contend that incidents occurring before September 16, 2005 are therefore time-barred

and cannot be considered.  However, under the continuing violation doctrine, if a plaintiff makes

at least one timely charge regarding an ongoing policy of discrimination, the limitations period is

extended for all other claims for discriminatory acts committed under that policy even if those

claims are otherwise time-barred. <u>Petrosino v. Bell Atlantic</u>, 385 F.3d 210, 220 (2d Cir. 2004);

Patterson v. Oneida County, NY, 375 F.3d 206, 220 (2d Cir. 2004). The continuing violation doctrine does not apply to "discrete discriminatory acts," which are not actionable if time-barred, even when related to acts alleged in timely claims. AMTRAK v. Morgan, 536 U.S. 101, 110-15, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002); Petrosino, 385 F.3d at 220; Elmenayer v. ABF Freight System, Inc., 318 F.3d 130, 134 (2d Cir. 2003). The Supreme Court in Morgan specifically identified "termination, failure to promote, denial of transfer, or refusal to hire" as examples of discrete acts, each of which starts a new clock for filing charges. Morgan, 536 U.S. at 114; Petrosino, 385 F. 3d at 220; Elmenayer, 318 F.3d at 134.

The Second Circuit interprets a hostile work environment as "in effect, a continuing violation" whose constituent parts are different in kind from discrete acts. Elmenayer, 318 F.3d at 134-35, citing Morgan, 536 U.S. at 115-16. A discrete discriminatory act is a "single completed action" that occurs at a specific time, and typically is actionable its on its own. Id. at 135. In contrast, a hostile work environment is composed of a "series of separate acts," each of which, though not generally actionable on its own, "collectively constitute" one unlawful "ongoing policy or practice" that usually cannot be said to occur at one particular moment. Morgan, 536 U.S. at 115, 117; Washington v. County of Rockland, 373 F.3d 310, 318 (2d Cir. 2004); Elmenayer, 318 F.3d at 134. Hostile work environments develop "over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Morgan, 536 U.S. at 115. Isolated incidents of discrimination do not ordinarily rise to the level of a hostile work environment, but the Second Circuit has held that even a single incident may do so, but only if it is severe enough to alter the terms and conditions of employment so as to create a hostile environment. Richardson v. New York State Dep't of

11

Correctional Serv., 180 F.3d 426, 437 (2d Cir.1999).

Plaintiff has alleged a series of incidents that occurred over the course of several years. None is severe enough, if taken alone, to be said to have independently created an objectively hostile environment on the basis of sex.  Nor are any of the alleged incidents, aside from Plaintiff's eventual termination, which occurred within the limitations period, the type of "discrete discriminatory act" that is actionable on its own, regarding which the statute of limitations serves to bar any complaint not filed within 300 days of the incident.  The incidents of which Plaintiff complains are actionable only because of the pattern or policy that they collectively establish.

A successful hostile work environment claim requires conduct that is "sufficiently severe or pervasive" to create an "abusive" workplace "permeated" with discriminatory "intimidation, ridicule and insult" that "unreasonably interferes" with an employee's work performance.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993); Patterson, 375 F.3d at 227.  There must also be a specific basis for imputing that hostile conduct to the employer.  Id.  If the claim meets these conditions and at least one of the acts of harassment falls within the statutory time period, then the court may consider all such acts, including those that would otherwise be untimely, in assessing the employer's liability.  Morgan, 536 U.S. at 116-17; Petrosino, 385 F. 3d at 220.  Plaintiff has successfully asserted a continuing violation, and it is appropriate to consider the incidents occurring before September 16, 2005 alongside the later ones in determining whether Defendants are entitled to summary judgment on Plaintiff's hostile work environment claim.

A hostile work environment claim is found in the existence in the workplace of

intolerable conduct or treatment of plaintiff sufficient to alter the work environment to a degree that materially, adversely changes the terms and conditions of employment or unreasonably dissuades an employee from complaining of such.  Hostile work environment claims have both objective and subjective components. Petrosino, 385 F. 3d at 221.  The discriminatory conduct must be so pervasive that a reasonable person viewing the "totality of the circumstances" would recognize an "objectively hostile or abusive work environment." Id. at 221-22.  Factors relevant in determining whether a workplace is objectively permeated with discrimination include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and whether any psychological harm resulted. Patterson, 375 F.3d at 227; Richardson, 180 F.3d at 437; Williams v. County of Westchester, 171 F.3d 98, 100-01 (2d Cir. 1999).

Only those actions which would have been materially adverse to a reasonable employee are Title VII actionable. See Robinson v. Shell Oil Co., 519 U.S. 337, 346, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997).  "[T]he ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing" do not give rise to a claim. Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). Title VII does not establish a "general civility code for the American workplace." Burlington Northern and Sante Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006); Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d. Cir 1999). What is required is abusive conduct of such severity and/or pervasiveness as to create a hostile environment which interferes with an employee's work, Alfano v. Costello, 294 F.3d 365, 373 (2d. Cir. 2002), and permeates the workplace with discriminatory intimidation, ridicule and insult of such severity

13

and pervasiveness as reasonably to be viewed as altering the conditions of employment. <u>Demoret</u> <u>v. Zegarelli</u>, 451 F.3d 140 (2d. Cir. 2006); <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986).  Altered conditions must be intolerable. <u>Harris,</u> 510 U.S. at 21. A merely "unpleasant, harsh, combative or difficult work environment" is insufficient. <u>Paddock v. Brockport</u>, 418 F. Supp. 2d 288, 291, 293 (W.D.N.Y 2000).

Defendants argue that even if all the incidents alleged by Plaintiff are considered, they still do not constitute a hostile work environment.  Viewing the evidence in the light most favorable to Plaintiff as the non-moving party, the court cannot say that no reasonable factfinder applying the standards above and viewing the totality of the circumstances would consider Plaintiff to have been subjected to an objectively hostile or abusive work environment on account of her sex during her employment with Defendants.  Defendants admit some of the incidents, and to the extent that Defendants contend that the incidents did not occur, or maintain that Plaintiff has mischaracterized or failed to report the incidents, those are issues of material fact and of credibility that are not properly decided upon motion for summary judgment.

Title VII prohibits discrimination on the basis of sex, including sexual harassment.  It does not ban all discussion or joking of a sexual nature in the workplace.  Unlike the comments by Mr. LeCours, the sexual discussions in which Ms. Barnard participated do not appear to be particularly suggestive of hostility or animus based on gender.  Nor is there an indication that Plaintiff was unable to exempt herself from these discussions, which occurred in the outdoor smoking area.  Whether sharing details about one's personal sexual life can constitute sexual harassment is highly dependent on the context, content and frequency of the comments, how graphic they are, the relationship between the parties, and whether the comments were calculated

to induce discomfort and/or persisted after complaints.  The purpose of Title VII is not to protect people from being offended or to purge all sexual discussion from the workplace; instead, the purpose is to prevent people's job security, advancement, or daily work environment from being materially impacted as a result of discrimination or harassment directed at them on account of their membership in a protected class.  Thus, it would be inaccurate to construe simple "over-sharing" about one's sex life as a Title VII violation.  On the other hand, there is no question that certain types of sexually-related "over-sharing" can and do convey a harassing or threatening message or reflect gender-based hostility.  Ms. Barnard's behavior in talking about her love swing appears to have been toward one end of this continuum, and Mr. LeCours' toward the other.  The allegations that LeCours repeatedly called women "fucking bitches," stood so close to Plaintiff as to make her uncomfortable, commented on her appearance, and summoned Plaintiff into his office to subject her to sexually-graphic and invective-laden rants about his ex-wife raise genuine issues of material fact relating to Plaintiff's claim of sexual harassment that are not to be resolved on a motion for summary judgment, contrary to Defendants' contention that Plaintiff's allegations, even if true, are insufficient to sustain a claim of sexual harassment.

While this is a close case, the evidence in support of Plaintiff's sexual harassment claim is not so weak, viewing the record in the light most favorable to Plaintiff and resolving all credibility disputes in her favor, that the Court can conclude at this point that no reasonable jury could find in Plaintiff's favor on the hostile work environment claims.  Accordingly, the motion for summary judgment on Plaintiff's hostile work environment claims (Counts One and Three) is denied.

**C.      Claims of Retaliatory Termination in Violation of Title VII and CFEPA**

Plaintiff's claims of retaliatory termination are analyzed under the three-part burden

shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973),

Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981), and St. Mary's

Honor Center v.  Hicks, 509 U.S. 502, 519, 524 (1993).  To make a *prima facie* case of

retaliation, Plaintiff must show by a preponderance of the evidence that she participated in a

protected activity known to Defendant, that she suffered an adverse employment action, and a

causal connection between the protected activity and the adverse employment action.  Slattery v.

Swiss Reinsurance Am. Corp., 248 F.3d 87, 94 (2d Cir. 2001).  A plaintiff's burden in

establishing a *prima facie* case is not an onerous one.  See Burdine, 450 U.S. at 254; Abdu-

Brisson v. Delta Air Lines, Inc., 239 F.3d 456,  467 (2d Cir. 2001) ("A plaintiff's burden of

establishing a *prima facie* case is *de minimis*.").

A plaintiff's establishment of a *prima facie* case gives rise to a presumption of unlawful

discrimination, and the burden of production shifts to the defendant.  Id. If the defendant then

proffers a "legitimate, nondiscriminatory reason" for the challenged employment action, Slattery,

248 F.3d at 91, "the presumption of discrimination drops out," Roge v. NYP Holdings, Inc., 257

F.3d 164, 168 (2d Cir. 2001), and the plaintiff must prove that the legitimate reasons offered by

the defendant were "not its true reasons but were a pretext for discrimination."  Id. (quoting

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)).  At all times, the ultimate

burden of persuasion remains with the plaintiff to show that the defendant intentionally

discriminated against the plaintiff.  Hicks, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 256).

Plaintiff engaged in protected activity when she allegedly complained about sexual

harassment to Doreen Christiano, Athena's Corporate Director of Census Management, on December 12, 2005 at an employee meeting.  Athena did not have a director of human resources at the time, which is why Ms. Christiano was sent to the meeting.  (Christiano Dep. at 36)  Ms. Christiano denies that Plaintiff complained to her of sexual harassment, stating that Plaintiff complained only about her hours.  (Christiano Aff. at ¶¶ 6-8)  This is a credibility dispute for jury resolution.  Plaintiff also claims to have informed LeCours and Barnard on numerous prior occasions that she found their behavior offensive, which is obviously relevant in assessing their continuation of said behavior, although it is questionable whether Plaintiff's complaints to the alleged perpetrators were reasonably calculated to notify Defendants Athena and Bayview of a situation they needed to address.  Plaintiff also claims to have complained repeatedly to Barnard about LeCours and sought to have Barnard intervene on Plaintiff's behalf with LeCours.  Finally, Plaintiff claims that on several occasions prior to December 12, 2005, she left voicemail messages with Athena Human Resources representative Thao Dinh complaining of harassment by LeCours and Barnard.  Plaintiff maintains that Dinh never returned her phone calls to follow up on these complaints.

The Second Circuit defines an "adverse employment action" as one in which a plaintiff endures a "materially adverse change in the terms and conditions of employment." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal citations omitted); see Williams v. R.H. Donnelley Corp., 368 F.3d 123, 128 (2d Cir. 2004).  For a change in working conditions to be "materially adverse," it must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Id.  Employment actions that have been deemed sufficiently adverse include "a termination of employment, a demotion evidenced by a decrease in wage or

salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id. (ellipsis in original) (citations omitted). Plaintiff suffered an adverse employment action when she was terminated on March 20, 2006.

In order to establish a *prima facie* case of retaliation, Plaintiff must show a causal connection between the protected activity and the adverse employment action, namely her termination. Causation can be demonstrated "indirectly by showing that the protected activity was followed closely by discriminatory treatment," "through other evidence such as disparate treatment of fellow employees who engaged in similar conduct," or "directly through evidence of retaliatory animus directed against a plaintiff by the defendant." De Cintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted). To demonstrate causation, Plaintiff relies primarily on the timing of her termination on March 20, 2006, three months after her December 12, 2005 complaint of sexual harassment. Temporal proximity of the adverse action to the protected activity is a key indicator of retaliation. See Mody v. GE, 2006 U.S. Dist. LEXIS 8611 at *31-32 (D. Conn. 2006); Clark City School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001).

To demonstrate causation based upon timing, the protected activity and the adverse employment action must be sufficiently close in time to support an inference that the two are related. The Second Circuit "has not established a specific delay between protected activity and adverse employment action that defeats an inference of causation." Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free School Dist., 411 F.3d 306, 314 (2d Cir. 2005). See also Gorman-Bakos v. Cornell Co-op Extension, 252 F.3d 545, 554-55 (2d Cir.2001) (listing cases in

18

the context of Title VII retaliation).  For instance, in Hollander v. American Cynamid Co., the Second Circuit held that a delay of three months between the protected activity and the allegedly retaliatory act was fatal to Plaintiff's showing of causation, 895 F.2d 80, 85-86 (2d Cir.1990), while in Grant v. Bethlehem Steel Corp., the court found that an eight-month delay supported a showing of causation.  622 F.2d 43, 45-46 (2d Cir.1980).  The operative issue is not simply the length of time between the protected activity and the alleged retaliation but the demonstrated nexus between the two.  "Although courts may infer a causal connection when an adverse action takes place shortly after the protected activity, Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988), we have affirmed summary judgment against the plaintiff when there was no evidence of causation other than timing."  Roa v. Mineta, 51 Fed. Appx. 896, 900 (2d Cir. 2002), citing Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-6 (2d Cir. 1990), cert. denied, 528 U.S. 965, 145 L. Ed. 2d 311, 120 S. Ct. 399 (1999).  Here, it is notable that the two people present at Plaintiff's termination, LeCours and Barnard, were the same two about whom she had complained only three months earlier.  Plaintiff contends that it was LeCours and Barnard, with final approval from Athena, who made the decision to terminate her.  Given these factors, three months is sufficiently proximate to suggest causation.

Plaintiff has met her relatively light burden to demonstrate causation and make a *prima facie* case.  Therefore, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action in question.  Defendants maintain that Plaintiff was fired on account of her "chronic negative attitude toward her job" (Def.'s Memo. in Supp. of Motion for Summ. Judgment at 14), not in retaliation for complaining of sexual harassment or because she attempted to exercise her rights under the FMLA.  Defendants'

contention that Plaintiff had a bad attitude about work is not entirely without support in the record.  However, there are several factors that suggest that this reason given for Plaintiff's termination may be pretextual.

For example, Plaintiff was ranked "Meets Standard" or "Above Standard" on all performance measures in her last formal written evaluation on July 27, 2005, eight months before her termination on March 20, 2006.  (Pl.'s Ex. 15.)  Plaintiff was ranked as "Meets Standard" for "Demonstrates patience, tact, enthusiasm and pleasant disposition to co-workers."  A handwritten note beside this item reads, "Attitude much improved!"  This comment bolsters Defendants' contention that Plaintiff had exhibited some attitude problems in the past.  However, consideration of the review as a whole shows that Plaintiff met or exceeded all performance requirements only eight months prior to her termination, which suggests that any attitude problems she may have had were not chronic or severe enough to preclude Defendants' general satisfaction with her job performance.  Indeed, LeCours allegedly told Plaintiff when she was being terminated that it was not for performance related reasons, but because she was not happy with her job, a curious comment since clearly maintaining an appropriate attitude is an aspect of performance.

Another piece of ambiguous evidence with respect to Plaintiff's alleged attitude problem is a complaint that she made on November 18, 2002, which was documented in an Employee Complaint Form, which was apparently filled out by whomever received Plaintiff's complaint.  Under the section labeled "Description of Complaint," it states:

> "[Plaintiff] feels she's being 'targeted;' 'they're trying to force me out.' [Plaintiff] was told she's walking around with a negative attitude; also was over-heard making negative comments about unit [secretary]; [Plaintiff] maintains none of this is true." (Pl.'s Ex. 3)

This suggests that others perceived Plaintiff as having a negative attitude as far back as 2002.  On the other hand, this is not a complaint filed by someone else about Plaintiff's alleged bad attitude. Instead, it was Plaintiff who filed a complaint indicating that she believed she was being unfairly characterized as having a bad attitude.  Defendants have pointed to no documentation of having counseled or disciplined Plaintiff regarding her attitude, although she did receive a written warning in 2005 for working more than her allotted hours without prior permission from her supervisor.  Plaintiff contends that pursuant to the discipline policy, she should have been given a verbal warning before the written one, and was not.

Perhaps most significantly, Defendants elected to rehire Plaintiff in 2003 after she had voluntarily left Defendants' employ several months earlier for another job.  As Defendants note, the memo they provided her to sign at the time of her rehiring suggests that it was not done without some reservations on Defendants' part with respect to her attitude, among other issues.[1] But having previously employed her, they chose to do so again, so they must have found her attitude tolerable on balance.  It is suspect that after Plaintiff had worked for Defendants for

---

[1] When Plaintiff was re-hired as a Unit Secretary at Bayview, the following letter was provided to her, which was signed by Plaintiff, LeCours, and Barnard.  (Def.'s Ex. F)  It read:
"You are being offered the Unit Secretary position at Bayview.  As you have had this position in the past, I am assured you will be able to complete the job successfully. The following areas are of concern to us, and need to be addressed, and will be monitored ongoing:
1.  Cooperation with charge nurses and supervisors
2.  Retaining information about issues relating to charge nurses, other staff members, and supervisors to the appropriate people
3.  Positive representation of yourself and Bayview, and its management.  You are a member of the management team as well as the staff team.
4.  Work independently
5.  Consultant tracking needs to be in place within four months.
We are glad you have agreed to accept this position!"

21

eleven years, her attitude suddenly became intolerable to them within months after she complained of sexual harassment and within days after she sought additional FMLA leave.  It is possible that her attitude had become markedly worse, justifying the termination, but Defendants have not produced sufficient evidence of that at this point.  Plaintiff also notes that she was twice promoted from CNA to Unit Secretary during her tenure with Defendants, which is suggestive of Defendants' satisfaction with her attitude and performance, but Defendants contend that the move between positions was lateral.

Finally, Plaintiff contends that in Defendants' response to her CHRO complaint, they indicated that she was terminated on account of the elimination of one unit secretary position, a statement which Defendants have not reiterated herein.  While some development and refinement of the explanation for termination is to be expected, abandonment of an earlier reason given could be indicative of pretext, particularly when considered in conjunction with other factors. On balance, while Defendants' allegations regarding Plaintiff's poor attitude are not unsupported in the record, she has raised sufficient questions as to whether her complaints about harassment were a precipitating factor in her termination to defeat summary judgment as to Counts Two and Four.

**D.      FMLA Interference and Retaliation Claims**

The FMLA entitles eligible employees to twelve weeks per year of unpaid leave "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the statute. 29 U.S.C. § 2615(a)(1).  A plaintiff may raise separate causes of

action for interference with the exercise of FMLA rights and employer retaliation against employees who exercise their FMLA rights. See Potenza v. City of New York, 365 F.3d 165, 167 (2d Cir. 2004).  Substantive rights under the FMLA subject to interference claims include the right to take leave, receive benefits during leave and be restored to the same or equivalent position following leave. See King v. Preferred Tech. Group, 166 F.3d 887, 891 (7th Cir. 1999); Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1287-88 (10th Cir. 2007); Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006).  The FMLA also "proscribes action by the employer to discriminate or to retaliate against an employee for the exercise of rights created by the Act." Rice v. Sunrise Express, Inc., 209 F.3d 1008, 1017 (7th Cir. 2000) (citing King, 166 F.3d at 891).

The distinction between FMLA interference and retaliation was summarized as follows in Gauthier v. Yardney Tech. Prods., 2007 U.S. Dist. LEXIS 67448, at *10-11 (D. Conn. Sept. 13, 2007):

> The Second Circuit in Sista v. CDC Ixis North America, Inc., 445 F.3d 161 (2d Cir. 2006), relying favorably on the Seventh Circuit's decision in King, recently clarified the elemental difference between interference and retaliation claims, and their respective burdens of proof required within the Second Circuit.  It held that claims of retaliation include employer intent as a material element of proof. Sista, 445 F.3d at 176. As such, retaliation claims are evaluated under the familiar burden shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)... [By contrast], to establish an interference claim pursuant to 29 U.S.C. § 2615(a)(1), the plaintiff need only prove that "the employer in some manner impeded the employee's exercise of his or her right[s]" afforded substantive protection under the FMLA. Sista, 445 F.3d at 176 (citing King, 166 F.3d at 891). A plaintiff bears the burden of establishing only a *prima facie* case for interference claims, and the court need not entertain the issue of the employer's intent. Id.

Defendants argue that Plaintiff's FMLA retaliation claim is unavailing because "other than temporal proximity, there is no evidence to relate any protected activity under the FMLA to

23

her discharge."  (Def.'s Memo. in Supp. of Mot. for Summ. Judgment at 18)  However, the evidence of temporal proximity is particularly compelling in this case, as Plaintiff was terminated just five days after informing Barnard of her intent to seek FMLA leave.  Nor is temporal proximity the only evidence upon which Plaintiff relies.  When Plaintiff told Barnard that she would be requesting additional FMLA leave for surgery on her foot, Barnard allegedly asked, "Does this mean you're going to take another three months off?" in reference to Plaintiff's having taken several months of FMLA leave after having had the same surgery on her other foot several months earlier.  This comment is susceptible to various interpretations depending on the tone it is given, from solicitous of Plaintiff's well-being, to merely information-seeking, to annoyed or resentful. The following day, Barnard sent Plaintiff a letter stating:

> Upon calculation of lost time due to FMLA, it has been determined that until September 28, 2006, you have five weeks of FMLA time left available to you per federal law guidelines.  Please be advised that any time taken beyond the five weeks of remaining leave between now and September 28, 2006 will result in loss of benefits and termination of employment under the law. (Pl.'s Ex. 10)

While this could reasonably be construed as simply informing Plaintiff of her remaining FMLA leave time, Plaintiff's interpretation of it as an expression of displeasure at her intent to request more FMLA leave is bolstered by the fact that Plaintiff was indeed terminated a mere four days later, before she had the chance to formally file for FMLA leave.  The statute makes clear that the "attempt to exercise" rights under the FMLA is protected, 29 U.S.C. § 2615(a)(1), which would mean that informing one's supervisor of one's intent to use FMLA leave is a protected exercise of FMLA rights.

In addition, Defendants' explanation that Plaintiff was fired on account of her bad attitude is susceptible to attack as pretextual for all the same reasons outlined above with respect to

Plaintiff's Title VII claim.  Finally, Defendants argue, entirely without merit, that the FMLA retaliation charge must be dismissed because LeCours testified that "he was completely unaware that [Plaintiff] had requested FMLA leave the week before her discharge" (Def.'s Memo. in Supp. of Mot. for Summ. Judgment at 18, citing LeCours Dep. at 65-66), and therefore it could not have played a role in her termination.  This neglects the fact that Barnard, who also participated in the termination, was clearly aware of Plaintiff's impending FMLA leave request, as evidenced by Barnard's letter to Plaintiff about it, which was carbon copied to LeCours and Athena Corporate.  (Pl.'s Ex. 10)

Defendants argue that Plaintiff's FMLA interference claim must be dismissed because it is duplicative of and merely restates her retaliation claim.  (Def.'s Memo. in Supp. of Mot. for Summ. Judgment at 19-21)  In support of her FMLA interference claim, Plaintiff alleges, "Defendants' conduct in questioning the Plaintiff for her need for an FMLA leave, threatening her, prior to the leave, with termination upon expiration of the leave, and discharging her five days after her FMLA request, interfered with, restrained or denied Plaintiff the ability to exercise her rights under the FMLA."  (Compl ¶ 52)  To establish a *prima facie* claim for FMLA interference, which is the extent of a plaintiff's burden with respect to such a claim, "a plaintiff must demonstrate that: 1) she was an eligible employee under the FMLA; 2) the defendant was an employer under the FMLA; 3) she was entitled to leave under the FMLA; 4) she gave notice to the defendant of her intention to take leave; and 5) the defendant denied her rights to which she was entitled by the FMLA." Gauthier, 2007 U.S. Dist. LEXIS 67448, at *11-12, citing Brown v. Pension Bds., 488 F. Supp. 2d 395, 408 (S.D.N.Y. 2007); Roberts v. Ground Handling, Inc., 499 F. Supp. 2d 340, 2007 U.S. Dist. LEXIS 23441, at *24-25 (S.D.N.Y. Mar. 30, 2007).

25

Here, Plaintiff was an eligible employee under FMLA, as evidenced by the fact that she had previously taken FMLA leave while working for Defendants.  Defendants were employers under the FMLA, as discussed at the outset of this opinion.  Plaintiff was entitled to five more weeks for FMLA leave, pursuant to the calculation in Barnard's March 16, 2006 letter to Plaintiff, and Plaintiff had previously taken FMLA leave for an identical surgery performed on her other foot, suggesting that she would have been medically eligible for FMLA leave for this surgery as well.  Plaintiff gave her supervisor Barnard notice of her intent to request FMLA leave, as evidenced the letter Barnard sent Plaintiff in response, and as admitted by Barnard. Finally, Plaintiff may establish the fifth element of a *prima facie* case if she can show that Defendants interfered with or denied her exercise or attempt to exercise her FMLA rights by terminating her employment before she could use FMLA leave which she had requested and for which she was otherwise qualified.  Accordingly, the motion for summary judgment as to Plaintiff's FMLA interference and retaliation claims (Counts Five and Six) is denied.

## IV.   Conclusion

For the reasons stated herein, Defendants' motion for summary judgment [Doc. No. 34] is **denied**. A trial preparation order shall issue.

SO ORDERED.

Dated at New Haven, Connecticut, February 26, 2009.

_____/S/_____
Peter C. Dorsey, U.S.D.J.